**SO ORDERED.**

**SIGNED this 1 day of May, 2019.**



**David M. Warren**
**United States Bankruptcy Judge**

___

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:                                                                    CASE NO. 17-00271-5-DMW

PENNY JO HAMILTON-GAERTNER
                                                                                          CHAPTER 11
        DEBTOR

### MEMORANDUM OPINION REGARDING CONFIRMATION OF PLAN

This matter comes before the court upon the Third Amended Plan of Reorganization ("Third Amended Plan") filed by Penny Jo Hamilton-Gaertner ("Debtor") on March 23, 2018 and the Objection thereto filed by Ascentium Capital LLC ("Ascentium") on May 1, 2018. The court conducted a hearing on May 10, 2018 in Raleigh, North Carolina. Clayton W. Cheek, Esq. appeared for the Debtor, Samuel D. Fleder, Esq. appeared for Ascentium, Gregory P. Chocklett, Esq. appeared for Direct Capital Corporation ("DCC"), and Brian C. Behr, Esq. appeared on behalf of the United States Bankruptcy Administrator ("BA"). Based upon the evidence presented and arguments of counsel, the court confirmed the Third Amended Plan pursuant to 11 U.S.C. § 1129(a) and entered an Order Confirming Plan ("Confirmation Order") on June 22, 2018. This opinion sets forth the court's findings of fact and conclusions of law in support of the Confirmation Order pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, made applicable by Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure.

# I. JURISDICTION

This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L) which the court has the authority to hear and determine pursuant to 28 U.S.C. § 157(b)(1). *See In re Cheatham*, 78 B.R. 104, 106 (Bankr. E.D.N.C. 1987) (finding confirmation of a debtor-in-possession's Chapter 11 plan of reorganization a core proceeding). The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334 and the General Order of Reference entered on August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

# II. FACTS AND BACKGROUND

## A. The Debtor and Family

The Debtor is a 54-year-old emergency room physician who is employed by Wake Emergency Physicians, PA ("WEPPA") and WakeMed Hospital ("WakeMed"). She is married and has three teenaged children. The Debtor's family lives in a home owned by her and her husband as tenants by the entirety. They also own as tenants by the entirety two Disney vacation condominium timeshares. The Debtor and her husband own three vehicles. All three of the Debtor's children attend private schools, with the eldest child matriculating to college in 2018. The middle child is at a specialized school to address her unique educational and emotional needs resulting from a diagnosed disability, and the other two attend parochial schools.[1]

## B. Sculpt MedSpa, PLLC

The Debtor formed Sculpt MedSpa, PLLC ("Sculpt MedSpa") in December 2014 to provide therapeutic and cosmetic medical treatments such as laser therapies and resurfacing, laser hair removal, tattoo removal, and robotic hair transplant. The Debtor was originally partnered with another doctor to open Sculpt MedSpa; however, that partner withdrew early in the process

---

[1] Since the hearing in this matter, the eldest child graduated from the parochial high school and enrolled in college.

2

for personal reasons. Sculpt MedSpa financed its startup and equipment costs through loans and leases from four different creditors, including Ascentium, DCC, and Pawnee Leasing Corporation ("Pawnee"). The loans were secured by medical equipment, and the Debtor personally guaranteed payment of each of these loans and leases.

Sculpt MedSpa struggled from inception and went out of business in the summer of 2016, approximately 16 months after opening. Sculpt MedSpa began surrendering collateral equipment, and each of its creditors filed suit against it and the Debtor in the Wake County Superior Court ("State Court") for recovery of outstanding indebtedness. On October 20, 2016, the State Court entered a Summary Judgment in favor of Ascentium for $186,710.07 plus applicable interest and costs, and on November 8, 2016, the State Court entered an Order for Summary Judgment in favor of DCC for $282,099.98 plus applicable interest and costs.

## C. The Debtor's Bankruptcy

To reorganize and pay her debts resulting from Sculpt MedSpa, the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code[2] on January 18, 2017. As part of the petition, the Debtor characterized her debts as primarily business debts which were incurred to obtain money for a business or investment or through the operation of the business or investment. She scheduled assets totaling $901,496.45 which are summarized as follows:

| | |
|---|---:|
| Residence (1/2 interest) | $ 475,000.00 |
| Disney Timeshares (1/2 interest) | 56,000.00 |
| 2014 Jeep Cherokee | 18,711.00 |
| 2008 Toyota Sequoia (1/2 interest) | 7,250.00 |
| Petrof Piano | 15,000.00 |
| Other Personal and Household Items | 10,850.00 |
| 401k Account | 318,249.66 |
| Other Financial Accounts | 435.79 |
| Total Scheduled Assets | $ 901,496.45 |

---

[2] Except for within formal citations, references to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, will be by section number only.

The Debtor claimed exemptions in most of these assets, most notably in her residence and the Disney timeshares pursuant to § 522(b)(3)(B) and the law of the State of North Carolina pertaining to property held as tenants by the entirety[3] and in her 401k account pursuant to § 522(b)(3)(C) and N.G. Gen Stat. § 1C-1601(a)(9).

The Debtor scheduled liabilities totaling $2,338,039.69 which are summarized as follows:

| | |
|---|---:|
| Secured Debt: | |
|    Residential Mortgages | $ 841,327.44 |
|    Disney Timeshare Mortgages | 62,653.00 |
|    Automobile Loans | 46,714.73 |
| Unsecured Debt: | |
|    Student Loans | 288,838.00 |
|    Ascentium | 201,358.69 |
|    DCC | 285,624.30 |
|    Pawnee | 65,777.24 |
|    Unsecured Joint Debt with Husband | 57,960.81 |
|    Unsecured Individual Debt | 487,785.48 |
| Total Scheduled Liabilities | $ 2,338,039.69 |

The Debtor's amended Schedule I reports net monthly income from her employment with WEPPA of $41,655.97 coupled with her husband's net monthly income of $3,489.98 for a total combined net monthly income of $45,145.95. Her amended Schedule J details monthly expenses totaling $31,617.13, including residential mortgage and expenses totaling $7,226.05, educational expenses of $4,818.64, car payments totaling $1,466.81, and timeshare mortgage and expenses totaling $1,624.84.

In her Disclosure Statement filed with the court on May 18, 2017, the Debtor updated her listings of assets and liabilities based in part upon claims filed in the case. She included a liquidation analysis that projected that in a Chapter 7 case, joint unsecured creditors would be paid

---

[3] The judgments against the Debtor in favor of Ascentium and DCC could not attach to the tenants by the entirety properties, but even if so, the attachments would likely be avoidable as preferential transfers under § 547(b), because the petition date is exactly 90 days after the State Court's entry of judgment in favor of Ascentium and within 90 days of the State Court's entry of judgment in favor of DCC.

4

in full from equity in the tenants by the entirety properties but that only $115,210.00 would be available to apply toward her individual unsecured obligations of approximately $1,433,528.85, equating to an 8% distribution.

D. The Plans

The Third Amended Plan before the court is the fourth plan of reorganization proposed by the Debtor, evolving over several months which included negotiations with Ascentium and DCC and the court's rejection of a plan agreed to by these creditors. The Debtor's initial Plan of Reorganization ("Original Plan") provided, *inter alia*, for payment on the residential and Disney timeshare mortgages allowed as fully secured claims, payment in full to joint unsecured creditors from an anticipated tax refund, and a distribution of approximately 17.5% to the individual unsecured creditors, including Ascentium and DCC, over a period of over 20 years. Ascentium and DCC filed a joint objection to the Original Plan, questioning the Debtor's good faith in paying less than 20% to unsecured creditors while continuing to maintain what they dubbed a "luxurious lifestyle" of paying housing and transportation costs that exceed the local Internal Revenue Service standards, two vacation timeshares, and private school education. Additionally, these creditors disputed that the Debtor was contributing all her projected disposable income as required in light of their objections pursuant to § 1129(a)(15). Finally, Ascentium and DCC opposed the preferential treatment given to the separate class of joint unsecured creditors. The BA filed a statement essentially echoing the concerns of Ascentium and DCC, and other creditors filed their own objections.

In response to the widespread opposition to the Original Plan, the Debtor sought and obtained extensions of the exclusivity and acceptance periods and filed two amended plans of reorganization. On March 6, 2018, the court conducted a hearing on the Debtor's Second

Amended Plan of Reorganization ("Second Amended Plan"). The Debtor reported that all classes of creditors had accepted the Second Amended Plan, including a newly created class that consisted solely of Ascentium and DCC and was designated as "Judgment Creditors." Both these Judgment Creditors voted to accept the Second Amended Plan, which proposed to pay their claims in full over a period of ten years with interest accruing at 4% per annum. The class of individual unsecured creditors, which now excluded the Judgment Creditors, would also be paid in full but over a 20-year period and with a lower interest rate of 1.25% interest per annum.

Despite full acceptance of the Second Amended Plan, the court viewed the discriminating treatment between the Judgment Creditors and the individual unsecured creditors as unjustified. Additionally, the court did not believe that payment to the individual unsecured creditors over 20 years, extending into the Debtor's mid-70s, was feasible. The court declined to confirm the Second Amended Plan and indicated that it would only consider a plan that paid unsecured creditors within a feasibly reasonable time, even if that meant paying these creditors less than the full amount of their claims.

The Third Amended Plan returns the Judgment Creditors to the individual unsecured class of creditors and proposes a 70% distribution to this class over a nine-year period, with interest of 1.25% per annum. Based upon the liquidation analysis, the separate class of joint unsecured creditors continues to receive 100% distribution to be paid over 20 years at 1.25% per annum, with the Debtor and her husband reserving the right to accelerate payments. Ascentium filed its Objection and voted to reject the Third Amended Plan; however, the majority of voting unsecured creditors, including DCC, accepted the Third Amended Plan for the class. All other designated classes of creditors also accepted the Third Amended Plan.

E. Financial Projections

At the hearing on confirmation of the Third Amended Plan, the Debtor presented a *pro forma* analysis of projected income and expenses through 2022. The Debtor anticipates earning between $400,000.00 and $405,000.00 annually in salary and bonuses from WEPPA and WakeMed. Her husband's annual salary is $41,880.00. From their combined income, the Debtor projects payment of the following annualized expenses:

| | |
|---|---:|
| Utilities | $ 31,200.00 |
| Insurance (car, real property, health, life) | 12,600.00 |
| Food | 21,000.00 |
| Medical/Dental | 4,200.00 |
| Personal Care | 2,400.00 |
| Transportation | 12,000.00 |
| Clothing | 3,000.00 |
| Gifts and Donations | 1,800.00 |
| Entertainment | 3,000.00 |
| Household Supplies | 6,000.00 |
| House/Lawn Maintenance | 9,600.00 |
| Other Expenses (extracurriculars) | 12,000.00 |
| Schooling | 34,288.30 |
| Property Taxes | 5,500.00 |
| Husband's Expenses | 38,642.55 |
| Total Expenses | $ 197,230.85 |

After payment of these expenses, the Debtor's remaining income would be devoted to payments under the Third Amended Plan which total approximately $208,000.00 annually, including $95,717.52 to the individual unsecured creditors. The Debtor represented that payment of the Disney timeshare mortgages, while being treated under the Third Amended Plan, would be paid by her husband and not from her income.

III. DISCUSSION

Section 1129(a) sets forth 16 requirements for confirmation of a Chapter 11 plan, and a debtor must show that all these requirements have been met before confirmation will issue. *Fed. Land Bank of Columbia v. Cheatham (In re Cheatham)*, 91 B.R. 377, 379 (E.D.N.C. 1988). "Even

in the absence of creditor objections, the court has an independent duty to determine that the confirmation requirements of 11 U.S.C. § 1129 are met and the duty to ascertain the debtor's 'good faith.'" *In re Landscaping Servs., Inc.*, 39 B.R. 588, 590 (Bankr. E.D.N.C. 1984) (citing *In re Economy Cast Stone Co.*, 16 B.R. 647 (Bankr. E.D. Va. 1981)).

A confirmation analysis begins appropriately with § 1129(a)(8), which dictates that each class of claims has either accepted the plan or is not impaired under the proposed plan. If § 1129(a)(8) is not satisfied, then a plan is nonetheless confirmable pursuant to a "cramdown" if all other requirements of § 1129(a) are met and the court finds that "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). The Debtor's Ballot Report reflects that each of the Plan's eight classes has accepted the Plan, thereby satisfying § 1129(a)(8). The parties concede, and the court finds easily without the need for discussion, that the Debtor has also satisfied as applicable §§ 1129(a)(1), (2), (4), (5), (6), (7), (9), (10), (12), (13), (14), and (16). Ascentium's Objection challenges predominantly whether the Plan has met the good faith requirement of § 1129(a)(3), the feasibility requirement of § 1129(a)(11), and the disposable income requirement of § 1129(a)(15)(B).

A. Section 1129(a)(3)

Section 1129(a)(3) requires that "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). As recently observed by this court—

> [a]lthough the term "good faith" is not defined by the Code, courts have generally interpreted it to mean there is a "'reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984) (quoting *In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr. S.D. Cal. 1982)). In addition, the Fifth Circuit has held that "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied." *Heartland Fed. Sav. & Loan Ass'n v. Briscoe*

> *Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1167 (5th Cir. 1993). When conducting a good faith inquiry, a court must view the plan in light of the totality of the circumstances surrounding the proposal of the plan. *In re Piece Goods Shops Co., L.P.*, 188 B.R. 778, 790 (Bankr. M.D.N.C. 1995).

*In re Bate Land & Timber, LLC*, 523 B.R. 483, 492-93 (Bankr. E.D.N.C. 2015). Ascentium argues that the Debtor's expenses are excessive and unnecessary and support a lifestyle that should not be maintained to the detriment of her unsecured creditors who are being paid less than the full amount of their claims. In support of this position, Ascentium cites a string of cases which find expenses such as private school tuition, maintaining a vacation home, and repayment of pension loans to be unreasonable and unnecessary and indicative of a lack of good faith, most notably this court's decision in *In re Osborne*, No. 12-00230-8-SWH, 2013 WL 2385136 (Bankr. E.D.N.C. May 30, 2013).

In *Osborne*, the debtors had approximately $140,000.00 in cash and projected a healthy annual gross income of between $200,000.00 and $300,000.00. Their monthly budget included residential mortgage and costs of almost $5,000.00, beach property mortgage and expenses of approximately $3,750.00, automobile loan and other transportation costs exceeding $1,300.00, household and recreation expenses of almost $1,500.00, and private school tuition of $1,450.00. The debtors proposed to pay over five years a total of $20,000.00 toward the general unsecured claims that totaled over $500,000.00, a distribution of less than 4%. The court found that—

> based on the debtors' massive $140,000 "war chest," extremely high income, retention of substantial assets, and their spending habits, a proposed distribution of $20,000 over the course of five years is not indicative of a good faith desire to repay creditors. Instead, it is somewhat like tossing the unsecured creditors a bit of spare change. . . . In this case, the male debtor has reached a level of income that many people will never attain, even in dual income households. At the same time, the debtors maintain significant financial obligations, including a spacious primary home and exclusive vacation home, as well as a luxury vehicle and private schooling for their son. And, as clearly shown in the monthly reports and testimony, the debtors spend significant amounts of money on food, clothing, and recreation. A plan that allows the debtors to maintain such a high cost lifestyle,

9

> while paying only $20,000.00 to unsecured creditors and retaining $140,000.00 in the bank, certainly cannot be consistent with the purposes and objectives of the Bankruptcy Code. While the Code confers many benefits to debtors, continued maintenance of an extravagant lifestyle surely was not intended to be one of them.

*Id.* at *9. While instructive, *Osborne* presents facts and circumstances quite different from this case. The court does not condone debtors living extravagantly and agrees that the Debtor's expenses exceed what is required to maintain comfortable lifestyle; however, based upon the Debtor's testimony and the totality of circumstances surrounding this case, the court cannot find that the Third Amended Plan is proposed in bad faith.

The expenses of which Ascentium complains did not contribute to the financial crisis that prompted the Debtor to seek bankruptcy relief. This case was filed to address the judgments obtained by Ascentium and DCC, and the Debtor spent over a year negotiating with these creditors to present a plan acceptable to both them and the court. The Debtor testified that she was counseled on the alternative option of filing for Chapter 7 relief, which according to her liquidation analysis would result in only an 8% distribution to unsecured creditors; however, she opted for Chapter 11 reorganization out of what the court deems a genuine desire to pay more to these creditors. Even after the court rejected the Second Amended Plan, the Debtor did not consider dismissal or conversion and continued in her efforts to present a confirmable plan.

Ascentium suggests that a Chapter 7 case for the Debtor would be an abuse of the Bankruptcy Code, making her ineligible for discharge. The court is skeptical of this possibility. The court may "dismiss a case filed by an individual debtor under this chapter *whose debts are primarily consumer debts* . . . if it finds that the granting of relief would be an abuse of the provisions of this chapter." 11 U.S.C. § 707(b)(1) (emphasis added). It is well-settled in this district and beyond that § 707(b) is inapplicable if the debtor's debts are primarily business in nature. *See*, *e.g.*, *In re Cromwell*, No. 14-03707-5-SWH, 2015 WL 1119711, at *2 (Bankr.

10

E.D.N.C. Mar. 6, 2015); *In re Fish*, No. 13-05783-8-RDD, 2014 WL 657247, at *2 (Bankr. E.D.N.C. Feb. 20, 2014); *In re Jones*, No. 08-05676-8-ATS, 2009 WL 102442, at *1 (Bankr. E.D.N.C. Jan. 12, 2009). The court previously adopted a "totality of the circumstances" approach to determining whether a debtor's debts are *primarily* consumer debts, consistent with the United States Court of Appeals for the Fourth Circuit's precedent for applying a totality test in determining good faith in filing petitions in Chapters 13 and 7. *Jones*, 2009 WL 102442, at *2 (citing *Neufeld v. Freeman*, 794 F.2d 149, 152 (4th Cir. 1986); *Green v. Staples (In re Green)*, 934 F.2d 568, 573 (4th Cir. 1991)).

While the issue is not before the court, it believes that the Debtor has viable arguments that her debts are not primarily consumer in nature. The unsecured debts of Ascentium, DCC, and Pawnee total less than half of all unsecured debt; however, the Debtor's testimony revealed that some seemingly consumer debts are rooted in the failed business. For instance, the Debtor secured a loan to help pay the business expenses with her previously unencumbered vehicle, and she borrowed money from her retirement account to pay business debt. At the hearing, the BA noted that a student loan, especially for obtaining a professional degree, may in certain circumstances be characterized as a business debt, and the court acknowledged this possibility in *Cromwell*.[4] *Cromwell*, 2015 WL 1119711, at *5. Finally, under a totality test, it would be difficult to overlook the fact that executions on Ascentium's and DCC's judgments, which are business debts, appear to be the predominant reasons for the Debtor's bankruptcy filing.

The court recognizes that while the Debtor is well-paid, this healthy income is the result of her demanding and dedicated work as an emergency room physician. The Debtor testified that she

---

[4] The court declined to adjudicate whether the subject student loans did indeed qualify as business debt as asserted by the debtors, because their classification would not impact the court's analysis under § 707(b)(1). *Cromwell*, 2015 WL 1119711, at *5

11

works 40-60 hours a week, and she is committed to continuing this schedule throughout the life of the Third Amended Plan, at an age when others in her profession are likely reducing their workload. The Third Amended Plan reserves the Debtor's right to obtain a discharge until after completion of payments to creditors. The Debtor is devoting an average of approximately $8,000.00 per month or $96,000.00 per year toward the payment of unsecured creditors, and through its Objection, Ascentium suggests that she should further curb expenses to allow for a greater or quicker overall disbursement.

The Debtor explained convincingly why reducing some of her expenses deemed extravagant by Ascentium was neither practical nor desirable. The Debtor contends that her home would need extensive repair to be marketable and her cars are older models with high mileage. The Debtor admitted that her food expenses are greater than for the average family but maintains that the demands of her job necessitate take-out and other convenience meals which cost more than home cooking. Ascentium does not dispute the decision to send the disabled child to a specialized, private school but contends that the others should be in public school while the Debtor reorganizes in bankruptcy. The Debtor's eldest child is headed to college with a partial scholarship for an out-of-state public university that makes the tuition comparable to in-state public universities. The Debtor explained the need to pay the tuition for the Debtor's youngest child to attend a parochial school. The Debtor believes firmly that this education is in her child's and her family's best interest and is committed continuing this expense. The court might agree with Ascentium if the Debtor were not proposing a distribution to unsecured creditors substantially higher than required. Most cases that find paying private school tuition in lieu of creditors as indicative of bad faith reflect a meager distribution to unsecured creditors. The court suspects that the Debtor's continued career motivation is fueled in part by a desire to provide her children with a premium education,

12

and the Third Amended Plan is a good faith attempt to contemporaneously satisfy this goal and provide graciously to the Debtor's unsecured creditors.

Of all the Debtor's continued household expenses, the court is most troubled by the Disney timeshare mortgages, because retention of the timeshare interests is not necessary to an effective reorganization. Requiring surrender, however, is not easy given the tenants by the entirety ownership between the Debtor and her non-filing husband and the Debtor's assurances that the mortgages will paid only from his income. Like with the private school tuition, the court cannot find that retention of the Disney timeshares is indicative that the Third Amended Plan is proposed in bad faith when considering the totality of what is being provided to Ascentium and other creditors under this plan.

## B. Section 1129(a)(11)

Section 1129(a)(11), known as the feasibility test, requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). Whether a plan is feasible is a question of fact for which the debtor bears the burden to show feasibility by a preponderance of the evidence. *In re Radco Props., Inc.*, 402 B.R. 666, 678 (Bankr. E.D.N.C. 2009) (citations omitted). "Feasibility is 'firmly rooted in predictions based on objective fact.'" *Id.* (quoting *Cheatham*, 78 B.R. at 109). Feasibility "does not require that the debtor's plan is guaranteed to be successful, but must merely 'present a workable scheme or organization and operation from which there may be a reasonable expectation of success.'" *In re Gyro-Trac (USA), Inc.*, 441 B.R. 470, 482-83 (Bankr. D.S.C. 2010) (quoting *Crestar Bank v. Walker (In re Walker)*, 165 B.R. 994, 1004 (E.D. Va. 1994)).

Ascentium argues that the Third Amended Plan is not feasible, because the Debtor's monthly reports reflect expenses that exceeded scheduled projections, and her expenses will increase with commencement of payments under the Third Amended Plan. Ascentium contends that payment to the individual unsecured creditors "70% of their claims over a period of nine (9) years at 1.25% interest . . . is both unsustainable and unreasonably long." Objection ¶8, ECF No. 210. The issue of feasibility was first raised by this court in its consideration of the Second Amended Plan which stretched out payment over 20 years. The court is satisfied with the Debtor's reduction of the overall payment period to individual unsecured creditors by more than half and is persuaded that the Debtor's projections of income and expenses are reasonably accurate. The Debtor has demonstrated a commitment to the Third Amended Plan, and absent unforeseen circumstances, the Debtor can continue her current job performance for the next decade. Ascentium remains protected by the reservation of discharge for the Debtor until completion of the Third Amended Plan.

### C. Section 1129(a)(15)

Finally, Ascentium's Objection triggers the applicability of § 1129(a)(15) which provides that—

> [i]n a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan—
>
> (A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
>
> (B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

11 U.S.C. § 1129(a)(15). This subsection was added by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") and incorporates the Chapter 13 projected disposable income requirement triggered when an unsecured creditor that is not being paid the full value of its claim objects to a proposed plan. *See* 11 U.S.C. § 1325(b)(1).[5] Section 1325(b)(2) defines "disposable income" as "current monthly income received by the debtor . . . less *amounts reasonably necessary to be expended.*" 11 U.S.C. § 1325(b)(2) (emphasis added). Section 1325(b)(3) goes on to provide that what constitutes "amounts reasonably necessary to be expended" shall be determined in accordance with subparagraphs (A) and (B) of § 707(b)(2), familiarly known as the "means test," if the Chapter 13 debtor is above an applicable median family income benchmark.

The Chapter 7 means test compares an individual debtor's monthly income to the median income for that debtor's state, and if the debtor's income is greater than the median, then allowed expenses are subtracted to determine whether the debtor would have enough disposable income to pay toward unsecured debts. For basic necessities such as housing and utilities, transportation, food, and clothing, the means test allows deductions for amounts specified under the National Standards and Local Standards rather than the debtor's actual expenses for these categories. *See* 11 U.S.C. § 707(b)(2)(A)(ii).

---

[5] This subsection is similar to § 1129(a)(15) and provides that—

[i]f the trustee or the holder of an allowed secured claim objects to the confirmation of the [Chapter 13] plan, then the court may not approve the plan unless, as of the effective date of the plan—

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

11 U.S.C. § 1325(b)(1).

15

Ascentium proffers that § 1129(a)(15) adopts the means test for calculating projected disposable income, and because the Debtor earns significantly more than the applicable median income in North Carolina, her projected disposable income must be calculated using the standardized expenses rather than her actual expenses. Under this analysis, her projected disposable income is certainly more than being paid toward the Third Amended Plan. The BA questioned whether the means test applies in Chapter 11, and the court now finds that it does not.

Soon after the enactment of BAPCPA, the United State District Court for the District of Kansas considered the argument that the means test applies in Chapter 11, noting that "[s]ince § 1325(b)(3) specifies that the expense portion of the calculation of projected disposable income under § 1325(b)(2) for an above-median-income debtor must be determined according to the Chapter 7 means test, this is a plausible way to interpret § 1129(a)(15)(B)'s incorporation of § 1325(b)(2)." *In re Roedemeier*, 374 B.R. 264, 272 (Bankr. D. Kan. 2007). The court did not, however, agree with this interpretation. The court focused on the three official bankruptcy forms concerning "current monthly income" for individual debtors and the drafters' deliberate omission of means test expenses from the Official Form 22B applicable to individual Chapter 11 debtors:

> The Chapter 11 form is the simplest of the three [22A, 22B, and 22C], since the means-test deductions of § 707(b)(2) are not employed in determining the extent of an individual Chapter 11 debtor's disposable income. Section 1129(a)(15) requires payments of disposable income "as defined in section 1325(b)(2)," and that paragraph allows calculation of disposable income under judicially-determined standards, rather than pursuant to the means test deductions, specified for higher income Chapter 13 debtors by § 1325(b)(3).

*Id.* (quoting Section D.2. of 2005 Committee Note to Official Bankruptcy Forms 22A, 22B, and 22C, *reprinted in* Norton Bankruptcy Law and Practice 2d, Bankruptcy Rules, at 1146 (Thomson/West 2006–2007 ed.)). The *Roedemeier* court concluded that "§ 1129(a)(15)(B) must

16

be read to allow a judicial determination of the expenses that are reasonably necessary for the support of the debtor and his or her dependents." *Id.* at 272-73.

More recently, the United States Bankruptcy Court for the District of Nebraska followed *Roedemeier* and reasoned that—

> [s]ection 1129(a)(15) specifically incorporates Chapter 13's disposable income definition found in § 1325(b)(2), but it is silent as to the determination of reasonable expenses for purposes of calculating disposable income. That is, while § 1325(b)(3) can be read as an instructional section of permissible expenses for § 1325(b)(2)— and, therefore, presumably incorporated into § 1325(b)(2)— § 1129(a)(15) does not include it. The omission seems intentional, as noted in a leading bankruptcy treatise:
>
>> [T]he reference in section 1129(a)(15) is explicitly to, and only to, paragraph (2) of section 1325(b). Congress had it within its power to draft the cross-reference more broadly, but did not. It presumably took into account the business orientation of most chapter 11s, as well as the increased levels of creditor involvement in a [sic] chapter 11 cases. These factors, together with the requirement that the debtor obtain the consent of all unsecured creditor classes under section 1129(a)(8), would tend to indicate that individual creditor insistence on the artificial expenses standards found in chapter 7 are neither necessary nor appropriate in chapter 11 cases.

*In re Woodward*, No. BK11-40936, 2014 WL 1682847, at *4-5 (Bankr. D. Neb. Apr. 29, 2014) (quoting 7 *Collier on Bankruptcy* ¶ 1129.02[15][a] (16th ed. rev. 2014)).[6] *See also In re Johnson*, No. 14-57104, 2016 WL 8853601, at *17 (Bankr. S.D. Ohio Nov. 10, 2016) (finding that the rule of statutory construction for applying the plain meaning of a statute requires holding that the Chapter 7 means test applicable to above-median income debtors in Chapter 13 does not also apply in Chapter 11); *In re Bacardi*, No. 09 B 25757, 2010 WL 54760, at *5 n. 2 (Bankr. N.D. Ill. Jan. 6, 2010) (opining that the means test does not apply in Chapter 11, because § 1129(a)(15) mentions § 1325(b)(2) but not § 1325(b)(3)); *but see In re Bennett*, No. 07-10864-SSM, 2008 WL 1869308,

---

[6] The *Roedemeier* court also referenced *Collier on Bankruptcy* in describing as "flawed" the position taken by Ascentium that calculation of a Chapter 11 debtor's disposable income must use expenses established by the Internal Revenue Service rather than actual expenses. *Roedemeier*, 374 B.R. at 272.

17

at *2 n. 6 (Bankr. E.D. Va. Apr. 23, 2008) (suggesting that the means test may apply in calculating "projected disposable income" under § 1129(a)(15)).

The court agrees that in considering whether the Debtor is dedicating her projected disposable income to the Third Amended Plan, it may judicially determine under § 1325(b)(2) what expenses are reasonably necessary to be expended rather than apply the means test. As discussed *supra*, the court is satisfied that the Debtor's projected expenses are reasonable and necessary under the totality of the circumstances. The Debtor's projected income exceeds these expenses by over $200,000.00 annually, all of which she is dedicating to the Third Amended Plan in satisfaction of § 1129(a)(15)(B).

## IV. CONCLUSION

When Ascentium, along with DCC and the BA, objected to the Debtor's Original Plan, the court shared the concerns about the Debtor's lifestyle and expenses in the midst of financial reorganization. The court has since been impressed by the Debtor's continued efforts to structure a plan that strikes a balance between being fair to her business creditors and allowing her to support her family in a similar manner to which they are accustomed. The Debtor's expenditures undoubtedly exceed what is necessary to maintain a minimal standard of living; however, she has made some concessions, and considering the totality of the Debtor's circumstances, the court cannot find that the Third Amended Plan is either proposed in bad faith or infeasible.

The Debtor was prepared to pay Ascentium and her other unsecured creditors 100% of their claims and was stopped short only by this court's concern over feasibility of the length of the repayment term and the preferential treatment given to the Judgment Creditors in negotiation of the Second Amended Plan. The court is somewhat surprised that Ascentium renewed its initial objections to confirmation simply because the Third Amended Plan reduced expected payment on

its claim to 70%. This distribution is significantly higher than Ascentium could expect in a Chapter 7 liquidation, and conversion appears to be a realistic option for the Debtor given the business nature of many of her debts. For almost the next decade, the Debtor is devoting her projected disposable income to the Third Amended Plan, and her discharge is contingent on her performance. For these reasons, the court found that the Debtor satisfied all the requirements of § 1129(a), overruled Ascentium's Objection, and entered the Confirmation Order.

**END OF DOCUMENT**